UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

EVA PEARL EVANOCK,      )    CIVIL ACTION NO. 4:19-CV-889
          Plaintiff      )
                      )
     v.                )
                      )    (ARBUCKLE, M.J.)
ANDREW SAUL,[1]       )
          Defendant    )

<u>MEMORANDUM OPINION</u>

## I.   INTRODUCTION

Plaintiff Eva Pearl Evanock, an adult individual who resides within the Middle District of Pennsylvania, seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income under Title XVI of the Social Security Act. Jurisdiction is conferred on this Court pursuant to 42 U.S.C. §1383(c)(3)(incorporating 42 U.S.C. §405(g) by reference).

This matter is before me, upon consent of the parties pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (Doc. 10). After reviewing the parties' briefs, the Commissioner's final decision, and the relevant

---

[1]    Andrew Saul was sworn in as Commissioner of Social Security on June 17, 2019.  He is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d). *See also* Section 205(g) of the Social Security Act, 42 U.S.C. §405(g) (action survives regardless of any change in the person occupying the office of Commissioner of Social Security).  The caption in this case is amended to reflect this change.

portions of the certified administrative transcript, I find the Commissioner's final decision is supported by substantial evidence. Accordingly, for the reasons stated herein the Commissioner's final decision will be AFFIRMED.

## II.   BACKGROUND & PROCEDURAL HISTORY

On September 7, 2016, Plaintiff protectively filed an application for supplemental security income under Title XVI of the Social Security Act. (Admin. Tr. 16).  In this application, Plaintiff alleged she became disabled as of January 1, 2014, when she was forty-three years old, due to the following conditions: Type 2 diabetes, neuropathy, COPD, asthma, high blood pressure, heart condition (pumps only 40% blood), depression, and anxiety. (Admin. Tr. 145). Plaintiff alleges that the combination of these conditions affects her ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, climb stairs, remember, complete tasks, concentrate, understand, follow instructions, and use her hands. (Admin. Tr. 160). Plaintiff has a limited education and can communicate in English. (Admin. Tr. 27); (*See* 20 C.F.R. § 416.964) (defining limited education). Plaintiff has no past relevant work. (Admin. Tr. 26).

On March 1, 2017, Plaintiff's application was denied at the initial level of administrative review. (Admin. Tr. 16). On April 13, 2017, Plaintiff requested an administrative hearing. *Id*.

On May 14, 2018, Plaintiff, assisted by her counsel, appeared and testified during a hearing before Administrative Law Judge Charles Dominick (the "ALJ"). (Admin. Tr. 56). On June 18, 2018, the ALJ issued a decision denying Plaintiff's application for benefits. (Admin. Tr. 28). On July 13, 2018, Plaintiff requested review of the ALJ's decision by the Appeals Council of the Office of Disability Adjudication and Review ("Appeals Council"). (Admin. Tr. 123-124). Along with her request, Plaintiff submitted new evidence that was not available to the ALJ when the ALJ's decision was issued. (Admin. Tr. 9-10).

On April 23, 2019, the Appeals Council denied Plaintiff's request for review. (Admin. Tr. 1-4).

On May 23, 2019, Plaintiff initiated this action by filing a Complaint. (Doc. 1). In the Complaint, Plaintiff alleges that the ALJ's decision denying the application is not supported by substantial evidence, and improperly applies the relevant law and regulations. *Id.* As relief, Plaintiff requests that the Court award benefits, or in the alternative remand this matter for a new administrative hearing. *Id.*

On August 14, 2019, the Commissioner filed an Answer. (Doc. 8). In the Answer, the Commissioner maintains that the decision holding that Plaintiff is not entitled to disability insurance benefits was made in accordance with the law and regulations and is supported by substantial evidence. (Doc. 8, ¶ 10). Along with the

Answer, the Commissioner filed a certified transcript of the administrative record. (Doc. 9 *et seq.*).

Plaintiff's Brief (Doc. 11) and the Commissioner's Brief (Doc. 14) have been filed. Plaintiff did not file a reply. This matter is now ripe for decision.

III.   STANDARDS OF REVIEW

A.   SUBSTANTIAL EVIDENCE REVIEW – THE ROLE OF THIS COURT

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. *See* 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g) by reference); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be

"something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).

"In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F. Supp. 2d 623, 627 (M.D. Pa. 2003). The question before this Court, therefore, is not whether Plaintiff is disabled, but whether the Commissioner's finding that Plaintiff is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

B.   STANDARDS GOVERNING THE ALJ'S APPLICATION OF THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see also* 20 C.F.R. § 416.905(a).[2] To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.905(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. § 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether

_____

[2] Throughout this Report, I cite to the version of the administrative rulings and regulations that were in effect on the date the Commissioner's final decision was issued. In this case, the ALJ's decision, which serves as the final decision of the Commissioner, was issued on June 18, 2018.

the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. § 416.920(a)(4).

Between steps three and four, the ALJ must also assess a claimant's RFC. RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); *see also* 20 C.F.R. § 416.920(e); 20 C.F.R. § 416.945(a)(1). In making this assessment, the ALJ considers all the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. § 416.945(a)(2).

At steps one through four, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. 42 U.S.C. § 1382c(a)(3)(H)(i) (incorporating 42 U.S.C. § 423(d)(5) by reference); 20 C.F.R. § 416.912; *Mason*, 994 F.2d at 1064.  Once this burden has been met by the claimant, it shifts to the Commissioner at step five to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. § 416.912(b)(3); *Mason*, 994 F.2d at 1064.

Page 7 of 26

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. *Id.* at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 433 (3d Cir. 1999).

IV.   ANALYSIS

Plaintiff raises the following issues in her Brief:

(1)   Whether the Administrative Law Judge in this case failed to consider the significant medical diagnosis and findings in his review; and

(2)   Whether the Administrative Law Judge in this case failed to consider the actual medical evidence of the Plaintiff's treating physician that was submitted into the record.

(Doc. 11, p. 3).

A.   THE ALJ'S DECISION DENYING PLAINTIFF'S APPLICATION

In his June 2018 decision, the ALJ evaluated Plaintiff's application at steps one through five of the sequential evaluation process.

Page 8 of 26

At step one, the ALJ found that Plaintiff did not engage in substantial gainful activity at any point between September 7, 2016 (Plaintiff's application date) and June 18, 2018 (the date the ALJ decision was issued) ("the relevant period"). (Admin. Tr. 18). At step two, the ALJ found that, during the relevant period, Plaintiff had the following medically determinable severe impairments:diabetes mellitus, peripheral neuropathy of the bilateral lower extremities, degenerative joint disease of the left knee, chronic obstructive pulmonary disease, asthma, and emphysema. *Id*. The ALJ also found that Plaintiff had the following medically determinable non-severe impairments: gastro-esophageal reflux disease ("GERD"), acute recurrent streptococcal tonsillitis, transient ischemic attack, hypertension, hyperlipidemia, trochanteric bursitis of the right hip, anxiety, and depression. (Admin. Tr. 18-19). Plaintiff's complaints of left-hand pain and lower back pain were found to be not medically determinable. (Admin. Tr. 21). At step three, the ALJ found that, during the relevant period, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*.

Between steps three and four, the ALJ assessed Plaintiff's RFC. The ALJ found that, during the relevant period, Plaintiff retained the RFC to engage in

sedentary work as defined in 20 C.F.R. § 416.967(a) subject to the following

additional limitations:

> the claimant is limited to no more than occasional balancing, stooping,
> kneeling, crouching, and climbing on ramps or stairs, but never
> crawling and climbing on ladders, ropes or scaffolds. The claimant
> must avoid unprotected heights and dangerous moving machinery.
> The claimant would be limited to no more than occasional use of foot
> controls. The claimant must avoid concentrated exposure to dust,
> fumes, odors, gasses, and other pulmonary irritants, as well as extreme
> temperatures, extreme humidity, wetness, and vibration. The claimant
> would also need to be given the opportunity to alternate between
> sitting and standing every thirty (30) minutes. The claimant would be
> limited to simple, routine tasks not performed at a production rate
> pace.

(Admin. Tr. 23).

At step four, the ALJ found that none of Plaintiff's past work rose to the

level of substantial gainful activity. Thus, for the purposes of the ALJ's analysis

Plaintiff had no past relevant work. (Admin. Tr. 26). At step five, the ALJ found

that, considering Plaintiff's age, education and work experience, Plaintiff could

engage in other work that existed in the national economy. (Admin. Tr. 27). To

support his conclusion, the ALJ relied on testimony given by a vocational expert

during Plaintiff's administrative hearing and cited the following three (3)

representative occupations: Order Clerk (DOT #209.567-014); Document Preparer

(DOT #249.587-018); and Surveillance Monitor (DOT #379.367-010). *Id.*

B.   WHETHER THE ALJ CONSIDERED ALL THE OBJECTIVE EVIDENCE
     RELATING TO PLAINTIFF'S DIABETES AND RESPIRATORY IMPAIRMENTS

Although Plaintiff frames her first argument as a general challenge to the ALJ's failure to address, or mischaracterization, of certain pieces of objective evidence, this argument appears to be limited to a discussion of the evidence related to Plaintiff's diabetes, COPD, asthma and emphysema. Plaintiff argues:

> The Administrative Law Judge below failed to consider the significant medical findings and diagnosis in his review of this case in that the Plaintiff had a spirometry test performed at Susquehanna Health under the direction of Dr. Sarah McElroy on March 8, 2018. The Plaintiff's FEV was 1.70 or 58% of predicted and her FVC was 2.73 or 75% of predicted. Although these findings do not qualify under the Listing they certainly are indicative of severe chronic obstructive pulmonary disease and the Administrative Law Judge below failed to review them as part of his Findings, Decision and Order in this case (See Exhibits HO B5F and HO B7F of the Notice of Decision-Unfavorable).

> Records from Price Eyewear, Dr. Marcus Myers, specifically found that there was diabetic retinopathy which on November 14, 2016, the date of the eye exam, was mild and did not require additional treatment. This is further evidence of the severity of Plaintiff's diabetic condition to the extent that diabetic retinopathy was found even in a mild level in 2016. Although this examination indicates evidence of diabetic retinopathy, The [sic] Administrative Law Judge below specifically found that there were no signs of diabetic retinopathy in this claim (See HO B6F/7 of the Notice of Decision-Unfavorable).

> The records of Price Eyewear also confirm the Claimant's A1C was 12.5 on October 20, 2017, and that is rather extremely elevated as the goal for an A1C for Type 2 diabetic is 7.0. (See Exhibit HO B6F/7 of the Notice of Decision-Unfavorable).

The Plaintiff, Eva Pearl Evanock, has a documented diagnosis of Type 2 diabetic with Stage 3 chronic kidney disease and recurrent hypoglycemic episodes with glucose readings of 40 to 50 over the past month as indicated in Dr. McElroy's office notes of March 1, 2017. (See Exhibit B5F/78 of the Notice of Decision-Unfavorable).

In addition, the Plaintiff had overnight oximetry and pulmonary function tests performed and the Plaintiff's treating physician found "the overnight oximetry test suggests that the Plaintiff may qualify for oxygen in Medicare Group 1 because there are 17 minutes and 40 seconds spent with Sp02 less than or equal to 88. However, the Administrative Law Judge below review this test result and found it to be normal, contrary to the findings of the treating physician. (See Exhibits B5F/101 of the Notice of Decision-Unfavorable).

(Doc. 11, pp. 4-5).

In response, to Plaintiff's contention that the ALJ ignored and mischaracterized evidence relating to her medically determinable severe respiratory impairments of COPD, asthma and emphysema, the Commissioner argues:

With regard to her COPD, Plaintiff argues that [the] ALJ failed to mention a spirometry graph that she asserts indicated "severe chronic obstructive pulmonary disease" (Pl.'s Br. at 4; Tr. 414). Plaintiff's argument is unavailing. Although the ALJ did not specifically mention the spirometry graph, the ALJ indeed recognized that Plaintiff had the severe impairment of COPD, as well as emphysema and asthma (Tr. 18). The ALJ reviewed Plaintiff's treatment for these conditions, and significantly, he accounted for her functional limitations supported by the record (Tr. 23). As the ALJ discussed, Plaintiff's treatment records generally showed normal respiratory examination and normal oxygen saturation levels (Tr. 186, 229-30, 240, 292-93, 308, 330, 335). She was treated with medication and an inhaler as needed (Tr. 205, 227). Plaintiff's treating sources assessed that Plaintiff's condition was "stable" with treatment (Tr. 309). And,

Page 12 of 26

despite her respiratory conditions, Plaintiff continued to smoke heavily against medical advice and indicated that she could half [sic] a mile a mile before needed to rest (Tr. 237, 327). Moreover, Dr. Hutz, who reviewed Plaintiff's treatment records, found that Plaintiff was capable of at least a range of sedentary work (Tr. 92-94).

. . . .

Plaintiff also references an overnight oximetry study, which indicated that she may qualify for nocturnal oxygen under Medicare Group 1, that she claims the ALJ misinterpreted as normal (Pl.'s Br. at 5; Tr. 406-12). That is not the case. The ALJ did not characterize the results as normal (Tr. 25). On the contrary, he accurately listed the nocturnal oxygen saturation results and explicitly considered Plaintiff's need for oxygen while sleeping (Tr. 25, 408). However, this evidence did not support any additional work-related limitations other than those included in the ALJ's RFC assessment. Stated differently, Plaintiff's use of nocturnal oxygen—which the ALJ discussed—did not require additional work restrictions performed during a time of wakefulness.

(Doc. 14, pp. 17-18) (internal footnote omitted).

In his decision the ALJ summarized the evidence related to Plaintiff's respiratory impairments as follows:

Finally, the record documents that the claimant suffers from various pulmonary impairments, including chronic obstructive pulmonary disease (COPD), asthma, and emphysema. Treatment records from May 2016 through February 2018 document consistently normal oxygen saturation levels and indicate that, upon examination, the claimant exhibits normal breath sounds and shows no wheezing, stridor, or respiratory distress (Exhibits B5F, B7F). Furthermore, overnight oximetry testing from March 2017 noted an average SpO2 of ninety-two (92) percent throughout the duration with the highest at ninety-nine (99) percent and the lowest at eighty-six (86) percent (Exhibit B8F/2). In addition, a chest x-ray from June 22, 2017 showed evidence of possible pneumonitis but noted no plural effusion or gross focal consolidation (Exhibit B5F/1-1). The claimant currently takes

medication and uses inhalers as well as oxygen while sleeping and it is noted in the record that both the claimant's emphysema and COPD are "stable" with these treatment modalities (Exhibit B5F/18, 22, 62). However, to account for the claimant's respiratory impairments, the undersigned as limited her to sedentary positions that require no exposure to dust, fumes, odors gases, and other pulmonary irritants, as well as extreme temperatures, extreme humidity, and wetness.

(Admin. Tr. 23-24).

As an initial matter, Plaintiff's contentions that the ALJ characterized the March 2017 overnight oximetry testing "as normal" and ignored Plaintiff's use of oxygen while sleeping lacks merit. The above-quoted passage reflects that the ALJ noted Plaintiff's use of oxygen at night and accurately characterized the oximetry test. (*See* Admin. Tr. 407) (oximetry test showing highest SpO2 as 99, lowest SpO2 as 86, and average SpO2 as 92.6). Although, as conceded by the Commissioner the spirometry test was not discussed, "[t]here is no requirement that the ALJ discuss in its opinion every tidbit of evidence in the record," or even "make reference to *every* piece of relevant information." *Hurr v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004) (emphasis in original). I find that the ALJ did not err by failing to discuss the spirometry test. As noted by Plaintiff the spirometry test results do not qualify Plaintiff for disability under a listing. Furthermore, these test results by themselves do not suggest that any additional limitations not accounted for in the RFC are present. Accordingly, I find that remand is not

required for further consideration of the objective evidence relating to Plaintiff's diagnoses of COPD, asthma, and emphysema.

In response to Plaintiff's contention that the ALJ either ignored or mischaracterized evidence related to Plaintiff's diabetes, the Commissioner argues:

> Plaintiff's argument that the ALJ ignored three pieces of evidence, specifically hypoglycemic episodes, an elevated A1C result, and mild diabetic retinopathy mentioned in an eye exam, is likewise unpersuasive (Pl.'s Br. at 15). The ALJ was not required to specifically mention every tidbit of evidence related to Plaintiff's diabetes. He appropriately considered the longitudinal record of Plaintiff's diabetes and any associated functional limitations.

> First, contrary to Plaintiff's argument, the ALJ specifically mentioned Plaintiff's fluctuating blood sugars and episodes of hypoglycemia, which were documented during a period when Plaintiff was non-compliant with routine, home blood-sugar monitoring (Tr. 24-25, 208, 210, 223, 227, 335). Once Plaintiff began regularly checking her blood sugars, her insulin was adjusted accordingly, and in turn, her blood sugars stabilized (Tr. 305, 330). As the ALJ explained, Plaintiff's recent treatment notes demonstrated that she was "doing well on adjusted insulin and medications. (Tr. 24-25, 289, 305). Her blood sugars were stable, and she denied hypoglycemic episodes (Tr. 289, 305).

> Second, Plaintiff references an A1C of 12.5, which she claims was documented in an October 20, 2017 eye doctor's note (Pl.'s Br. at 5). The ALJ was not required to mention every lab value from the record—and impossible burden. In any event, the 12.5 A1C value was actually documented in an optical record on November 14, 2016, coinciding with the time period when Plaintiff was noncompliant with blood-sugar monitoring, and her blood sugars were abnormal and fluctuated (Tr. 396). By contrast, on October 20, 2017, her A1C was noted as 7.2, within the goal range Plaintiff references, once Plaintiff's compliance with blood-sugar monitoring was established and insulin was adjusted (Tr. 393).

Third, Plaintiff suggests that the ALJ mischaracterized Plaintiff's eye examination as showing no signs of diabetic neuropathy (Pl.'s Br. at 5). But the ALJ's characterization of Plaintiff's diabetic eye examinations is fully supported by the record. While Dr. Myer noted "mild" diabetic retinopathy in November 2016 when Plaintiff's blood sugars weren't controlled or monitored, he noted her condition was "mild" and did not require any treatment aside from getting her sugars under control (Tr. 286, 396). By contrast, in October 2017, Dr. Myer documented "no diabetic retinopathy" once Plaintiff complied with treatment, and in turn, her blood sugars stabilized (Tr. 397). Accordingly, the ALJ appropriately and accurately cited the findings from Plaintiff's latter diabetic eye examination.

(Doc. 14, pp. 19-21) (internal footnote omitted).

The ALJ addressed the objective evidence related to Plaintiff's diabetes as follows:

A review of the medical evidence of record documents that the claimant has a history of diabetes and peripheral neuropathy. Treatment records indicate that the claimant is currently under long-term use of insulin due to irregularity in blood sugar levels, with at-home readings fluctuating from one-hundred (100) to three-hundred (300) mg/dL (Exhibit B5F/78). However, Lauren Kershes, CRNP noted in April 201 that the claimant was "doing well" with her current treatment regimen of oral and injectable medications and reported in June 2017 that the claimant denied having any recent episodes of hypoglycemia (Exhibit B5F/18). Furthermore, while consultative examiner Justice Magurno, M.D. noted in April 2016 and January 2017 that the claimant exhibited some sensory deficit in her feet bilaterally, upon examination from October 2017 through February 2018, the claimant was noted to exhibit normal neurological functioning with no signs of sensory deficit (Exhibits B1F/6, B3F/6, B7F). In addition, diabetic eye examinations noted no evidence of diabetic retinopathy (Exhibit B6F/7). Furthermore, the claimant testified that she is currently compliant with taking her medication, along with diet and exercise recommendations from her treating physicians (Hearing Testimony). However, to account for sensory

Page 16 of 26

deficit in claimant's feet bilaterally, as evidence upon examination by Dr. Magurno, the undersigned has limited the claimant to sedentary positions requiring no more than occasional use of foot controls and no exposure to unprotected heights, dangerous moving machinery, and vibrations.

(Admin. Tr. 24).

In support of her argument that the ALJ failed to mention hypoglycemic episodes and stage three kidney disease Plaintiff cites to a treatment record dated May 26, 2016, which states as follows:

2. diabetes

The problem is getting worse. She has been managed with oral medications and insulin. Home glucose readings: Min 100, Max 300 Comorbidity: Macroscopic albuminuria (>300 mg/g Creatinine). Associated symptoms include: burning of extremities, frequent infections, frequent urination, increased fatigue and slow healing wounds/sores. Pertinent negative include blurred vision, dyspnea and hypoglycemic episodes.

(Admin. Tr. 365). To the extent Plaintiff argues that the ALJ failed to mention Plaintiff's glucose levels, the ALJ specifically mentioned that Plaintiff's glucose levels fluctuated between 100 and 300. To the extent Plaintiff is referring to the March 1, 2017 treatment note that states, "Type 2 diabetes mellitus with stage 3 chronic kidney disease, with long-term current use of insulin (Reports recurrent hypoglycemia episodes with glucose readings 40-50 over the past month," Plaintiff is correct that it was not discussed in the ALJ's decision. (Admin. Tr. 327). Nonetheless, I am not persuaded that remand is required for further discussion of

Page 17 of 26

this treatment note. Nothing in this note suggests that any further degree of limitation exists, therefore there is no reasonable possibility that remand for further consideration of this piece of evidence would result in a different outcome. *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.")

Plaintiff is also correct that the ALJ did not discuss her A1C levels, or that there was an earlier treatment note suggesting the presence of mild diabetic retinopathy (which Plaintiff does not dispute was resolved once she got her blood sugars under control). As with the records relating to her hypoglycemic episodes, none of these records suggest that additional limitations are present. Accordingly, I am not persuaded that remand is required for further consideration of this evidence.

C.   WHETHER THE ALJ PROPERLY EVALUATED THE MEDICAL OPINION EVIDENCE

The following medical sources provided opinions in this case: consultative examiner Justine Magurno, M.D. ("Dr. Magurno"); and State agency medical consultant David Hutz, M.D. ("Dr. Hutz").

On April 7, 2016, Dr. Magurno examined Plaintiff and completed a narrative report and medical source statement concerning Plaintiff's physical functional capacity. (Admin. Tr. 183-202). Dr. Magurno did range of motion testing and

spirometry as part of the examination. *Id.* In her narrative report, Dr. Magurno assessed the diagnoses of: diabetes; neuropathy; back pain; knee and ankle pain; COPD; asthma; decreased ejection fraction of heart; hypertension; elevated cholesterol; status post tia/cerebrovascular accident; neck pain; GERD; tobacco use; and tachycardia. *Id.* In her medical source statement, Dr. Magurno opined that Plaintiff could: frequently lift or carry up to ten pounds; sit up to one hour at a time, and for up to six hours per eight-hour workday; stand up to twenty minutes at one time, and for up to two hours per eight-hour workday; walk up to ten minutes at one time, and for up to one hour per eight-hour workday; continuously reach, handle, finger, feel, and push/pull with her hands and arms; frequently operate foot controls and stoop; and never climb stairs or ramps, climb ladders or scaffolds, balance, kneel, crouch, or crawl. *Id.* Dr. Magurno also assessed that Plaintiff used a medically required cane for ambulation, and that Plaintiff needed to work in an environment where she would never be exposed to heights, moving mechanical parts, dust, odors, fumes and pulmonary irritants, or vibration. *Id.*

On January 12, 2017, Dr. Magurno examined Plaintiff for a second time and completed a second narrative report and medical source statement concerning Plaintiff's physical functional capacity. (Admin. Tr. 237-249). In her second narrative report, Dr. Magurno assessed the diagnoses of: diabetes, poorly controlled, with neuropathy; low back pain with radicular symptoms; asthma and

emphysema; status post tia; history suggestive of cardiomyopathy; hypertension; and tobacco abuse. *Id.* In her second medical source statement, Dr. Magurno opined that Plaintiff could: frequently lift or carry up to ten pounds; occasionally lift (but not carry) up to twenty pounds; sit for up to one hour at a time, and for a total of six hours per eight-hour workday; stand for up to thirty minutes at one time, and for a total of three hours per eight-hour workday; walk up to twenty minutes at one time, and for a total of two hours per eight-hour workday; continuously handle, finger, feel and push/pull with her hands and arms; occasionally use her right foot and frequently use her left foot to operate foot controls; occasionally kneel; never climb stairs and ramps, climb ladders of scaffolds, balance, crouch or crawl. *Id.* Although Dr. Magurno noted in her second narrative report that Plaintiff walked with a quad cane, she did not assess whether that cane was medically necessary in her second medical source statement. *Id.* Dr. Magurno noted that Plaintiff had impaired vision but did not assess the extent of that impairment. *Id.* Last, Dr. Magurno assessed that Plaintiff could tolerate occasional exposure to extreme heat but would be unable to tolerate any exposure to unprotected heights, moving mechanical parts, humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold, or vibrations. *Id.*

As part of the initial review of Plaintiff's application, Dr. Hutz completed a physical capacity assessment based on a review of the available medical records on

February 10, 2017—including the reports and medical source statements completed by Dr. Magurno. (Admin. Tr. 92-94). Dr. Hutz opined that Plaintiff could: occasionally lift and/or carry up to twenty pounds; frequently lift and/or carry up to ten pounds; sit (with normal breaks) for up to six hours per eight-hour workday; stand and/or walk up to four hours per eight-hour workday; occasionally climb ramps/stairs, balance, stoop, kneel, and crouch; and never climb ramps or scaffolds. *Id.* Dr. Hutz also assessed that Plaintiff was limited in her ability to operate foot controls, bilaterally. *Id.* With respect to environmental limitations, Dr. Hutz assessed that Plaintiff should avoid concentrated exposure to extreme cold, wetness, vibration, and hazards (machinery, heights, etc.). *Id.* In support of this assessment, Dr. Hutz explained:

> The clmt. has left knee djd requiring a cane to ambulate & DM neuropathy with persistent decr. sensation B/L ft. Labs drawn 9-16 revealed very high A1c. Left knee imaging 9-16 revealed djd. PE with TP 10-10-16 revealed BP, heart, lungs, & B/L SLR all WNL with L spine TTP with decr. ROM. PE 1-12-17 revealed BP 130/78 with station, heart, lungs, & strength WNL, decr. sensation B/L ft., symm. DTR's, & quad cane use. The clmt. utilizes meds. for DM & neuropathy. According to her ADL's, the clmt. has no problems with personal care, cooks, cweeps [sic], does dishes & laundry, & can walk less than 1 mile.

(Admin. Tr. 94).

The ALJ afforded "little" weight to the April 2016 and January 2017 opinions by Dr. Magurno, and "little" weight to the opinions of Dr. Hutz. In doing so the ALJ explained:

> As for the opinion evidence, the undersigned has considered an April 2016 consultative examination performed by Justine Magurno, M.D., however, this opinion is afforded little weight as it is inconsistent with the overall record, including Dr. Magurno's own examination findings (Exhibit B1F). Specifically, Dr. Magurno noted sensory deficit in the claimant's feet bilaterally, however, she opined that the claimant could frequently use foot controls (Exhibit B1F/6, 10). In addition, despite the claimant's complaints of left knee pain and x-ray imaging demonstrating degeneration, Dr. Magurno opined that the claimant could sit for up to one (1) hour at a time without interruption (Exhibit 1F/9, 4F/4; Hearing Testimony). Furthermore, Dr. Magurno opined that the claimant could have continuous exposure to temperature extremes of hot and cold as well as humidity and wetness, conditions which the claimant testified would exacerbate her respiratory symptoms (Exhibit B1F/12; Hearing Testimony). Conversely, despite noting grossly normal musculoskeletal findings and perfect lower extremity strength, Dr. Magurno opined that the claimant could never balance, kneel, crouch, crawl, or climb, which are largely over-exaggerative of the claimant's actual degree of limitation in performance of these postural maneuvers (Exhibit B1F/6, 11).

> Furthermore, the undersigned has considered a second consultative examination performed by Dr. Magurno, M.D. in January 2017 and this opinion, like her first, is afforded only little weight (Exhibit B3F). In this opinion, Dr. Magurno again noted sensory deficit in the claimant's feet bilaterally and opined that the claimant could only occasionally operate foot controls with the right foot, however, she maintained that the claimant could frequently operate foot controls with the left (Exhibit 3F/6, 10). Additionally, Dr. Magurno again opined that the claimant could sit for up to one (1) hour at a time despite x-ray imaging demonstrating left knee degeneration (Exhibit 3F/9, 4F/4). Although this opinion imposed greater environmental limitations to account for the claimant's heightened instance of

respiratory symptomatology, Dr. Magurno still opined that the claimant could have occasional exposure to extreme heat, which the claimant testified causes her coughing fits (Exhibit B3F/12; Hearing Testimony). Finally, Dr. Magurno opined that the claimant could never balance, crouch, crawl, or climb, however this examination again documents relatively benign musculoskeletal and neurological examination findings not indicative of this degree of limitation (Exhibit B3F/6, 11).

Finally, the undersigned has considered the February 2017 opinion of State agency medical consultant David Hutz, M.D., however, more recent medical evidence supports greater limitations than Dr. Hutz provided and, therefore, his opinion is afforded only little weight. Specifically, Dr. Hutz opined that the claimant could stand and walk for a total of four (4) hours, sit for a total of six (6) hours in an eight-hour workday, with no contemplation of a sit/stand provision, and that she could occasionally crawl despite x-ray imaging showing degeneration in the claimant's left knee (Exhibit B1A/6. 7; B4F/4). Furthermore, Dr. Hutz opined that the claimant could have unlimited exposure to dust, fumes, odors, gases, and other pulmonary irritants, as well as extreme heat, and humidity, which is inconsistent with treatment records documenting pulmonary impairments causing reduced blood oxygen saturation levels (Exhibit B1A/7, B8F/2).

(Admin. Tr. 25-26).

On September 17, 2018—three months after the ALJ issued his decision in this case—treating source Sarah McElroy, D.O. ("Dr. McElroy") completed an employability assessment form for the Pennsylvania Department of Public Welfare. (Admin. Tr. 9-10). On that form, Dr. McElroy opined that Plaintiff was diagnosed with a peripheral vascular disease (Diagnosis code 173.9 in the ICD 10) and chronic bilateral low back pain with bilateral sciatica and assessed that these impairments would permanently preclude Plaintiff from engaging in any gainful

employment. *Id.* This evidence was not provided to the ALJ and was not added to the record until this case was pending before the Appeals Council.

In her brief, Plaintiff argues that that ALJ relied too heavily on the opinions by doctors Hutz and Magurno and did not give enough consideration to "the actual documented medical evidence of the treating physician, Dr. Sarah McElroy, submitted to the record." (Doc. 11, p. 6). Plaintiff then cites to cases and legal authority relating to the application of the "treating physician rule" codified in 20 C.F.R. § 416.927(c)(2) ("If we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."). It is not clear to me whether Plaintiff is arguing that Dr. McElroy's objective treatment records (which do not contain any medical opinion) are entitled to controlling weight under the treating physician rule, or whether she is arguing that remand is required because the employability assessment form completed by McElroy *after* the ALJ had already issued his decision is entitled to controlling weight.

To the extent Plaintiff is arguing that Dr. McElroy's objective treatment records are entitled to weight under the treating source rule, she is incorrect as a matter of law. The treating source rule applies only to medical opinions. 20 C.F.R.

§ 416.927(c)(2); *see also* 20 C.F.R. § 416.927(a)(2) (defining medical opinions). Plaintiff has not cited to any statement in Dr. McElroy's objective treatment records that constitute a "medical opinion." Accordingly, I find that Dr. McElroy's objective treatment notes are not entitled to controlling weight under the treating source rule.

To the extent Plaintiff is arguing that Dr. McElroy's September 2018 opinion is entitled to controlling weight, I am similarly unpersuaded. There are a limited number of options open to the District Court once the Appeals Council has denied review in a Social Security case. A District Court may affirm the decision of the Commissioner, modify the decision of the Commissioner, or reverse the decision of the Commissioner with or without a remand *based on the record that was made before the ALJ* under sentence four of 42 U.S.C. § 405(g). *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001). Where, as here, a claimant seeks to rely on evidence that was *not* before the ALJ, however, the District Court may remand "only if the evidence is new and material and if there was good cause why it was not previously presented to the ALJ." *Id.* To hold otherwise would create an incentive to withhold material evidence from the ALJ in order to preserve a reason for remand. *Id.* at 595.

Plaintiff has failed to demonstrate that the September 2018 opinion of Dr. McElroy is material—because it does not appear to relate to the relevant period at

Page 25 of 26

issue (from September 7, 2016 through June 18, 2018), and because Plaintiff has not shown that there is good cause as to why Dr. McElroy did not present her opinion to the ALJ.

Accordingly, remand is not required for further consideration of either Dr. McElroy's treatment records or her September 2018 employability assessment form.

## V.    CONCLUSION

Accordingly, Plaintiff's request for the award of benefits, or in the alternative a new administrative hearing is DENIED as follows:

(1)    The final decision of the Commissioner will be AFFIRMED.

(2)    Final judgment will be issued in favor of the Commissioner of the Social Security Administration.

(3)    An appropriate Order shall issue

Date: May 20, 2020                          BY THE COURT

*s/William I. Arbuckle*
William I. Arbuckle
U.S. Magistrate Judge